UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------

UNITED STATES OF AMERICA

            -v.-                         19 Cr. 603-1 (KPF)

MUNIF AHMED,                         **ORDER**

                             Defendant.

---------------------------------------

KATHERINE POLK FAILLA, District Judge:

      Defendant Munif Ahmed, who is currently housed at the Federal Correctional Institution in Lewisburg, Pennsylvania ("FCI Lewisburg"), has applied for compassionate release, in the form of a reduction in sentence to time served, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  In support, Mr. Ahmed cites various medical issues that he has experienced during his confinement and certain family circumstances.  The Government opposes this motion.  As set forth in the remainder of this Order, the Court denies Mr. Ahmed's motion.

## BACKGROUND

      The Court incorporates by reference the summary of Mr. Ahmed's offense conduct and prosecution that is set forth in the summary order issued by the United States Court of Appeals for the Second Circuit affirming his conviction and sentence.  *See United States* v. *Ahmed*, No. 21-2820-cr, 2023 WL 193623 (2d Cir. Jan. 17, 2023) (summary order).  In broad summary, for approximately one year beginning in July 2018, Mr. Ahmed headed a drug-trafficking ring that produced and distributed large quantities of smokable synthetic cannabinoids ("SSC"), known colloquially as "K2" or "Spice."  (*See* Amended Presentence Investigation Report ("PSR" (Dkt. #107)) ¶¶ 9-14).

In the fall of 2018, Ahmed recruited Maged Rady, Mohamed Rashed, and Redhwan Alzanam to join the conspiracy. (PSR ¶¶ 12-14). Mr. Ahmed secured an apartment in the Bronx (the "Bronx Apartment") to be used to manufacture SSC. The process involved spraying dried, shredded plant material such as marshmallow leaf with synthetic cannabinoid chemicals (which are typically controlled substances or controlled substance analogues); drying out the drug-treated plant material; and packaging the SSC into individual bags for distribution. (*Id.* ¶ 12). Later, Mr. Ahmed directed Mr. Alzanam to rent a storage unit, for which Mr. Ahmed paid, to store the SSC that was being produced in the Bronx Apartment. (*Id.* ¶¶ 11, 13). As the Government noted and the trial evidence demonstrated:

> Ahmed succeeded in manufacturing enormous quantities of SSC. (PSR ¶ 11; A. 81). Ahmed's cellphone contained his correspondence with one of his China-based suppliers, from whom Ahmed placed orders for hundreds of thousands of individual bags in which to package SSC and many kilograms of synthetic cannabinoid chemicals. (A. 144). Ahmed generally engaged in wholesale transactions, selling hundreds or thousands of individual bags at a time to other drug dealers. (PSR ¶ 14; A. 82, 144). Law enforcement officers executed a search warrant at Ahmed's storage locker, from which they recovered approximately 27 large laundry bags filled with tens of thousands of individual packages of SSC. (PSR ¶ 11; A. 82, 144).

(Dkt. #122 at 2).

Mr. Ahmed and several of his co-conspirators were initially arrested on a complaint issued on July 16, 2019. (Dkt. #1). On August 26, 2019, the grand jury returned an indictment charging Mr. Ahmed and Mr. Rashed with conspiracy to distribute a controlled substance analogue, in violation of Title

21, United States Code, Section 846. (Dkt. #17). Trial was originally scheduled for June 8, 2020 (Dkt. #40), but was adjourned because of the COVID-19 pandemic and ultimately rescheduled for April 19, 2021 (Dkt. #77). Mr. Ahmed alone went to trial, but changed course near the close of the Government's case in chief and pleaded guilty pursuant to a *Pimentel* letter on April 21, 2021. (PSR ¶ 5; Dkt. #88 (plea transcript)). In the *Pimentel* letter, the Government presented its then-current understanding of the application of the United States Sentencing Guidelines to Mr. Ahmed's case; it calculated the relevant range to be 292 to 365 months' imprisonment, capped by the statutory maximum of 240 months. (PSR ¶ 5).

Sentencing for Mr. Ahmed took place on October 28, 2021. (*See* Dkt. #108 (sentencing transcript); Dkt. #105 (judgment)). As relevant here, the Government sought a sentence of at least 60 months (Dkt. #103 at 1), while Mr. Ahmed sought a sentence of time served (approximately 28 months) and a term of supervised release (Dkt. #98 at 6).[1] After counsel for each side was given an opportunity to make an oral sentencing presentation, Mr. Ahmed spoke to the Court, during which he sought to minimize his involvement in the charged conspiracy and to claim that he had in fact withdrawn from the

---

[1] At other points, Mr. Ahmed sought a sentence of one year and one day. (*See, e.g.*, Dkt. #108 at 42). In the defense sentencing submission, Mr. Ahmed cited health issues, including a blood clot in his leg that he developed in 2017, as a basis for a downward variance. (*See* Dkt. #98 at 3-4, 7 & n.1). He also argued that his family was completely dependent upon him "emotionally and financially," citing among other things his wife's inability to speak English. (*Id.* at 2). His counsel then repeated these arguments at sentencing. (*See* Dkt. #108 at 10, 24-25).

3

conspiracy, both of which arguments were undermined by the evidence at trial. (Dkt. #108 at 27-34).

After taking a recess to consider the parties' arguments, the Court then imposed sentence:

> This case is different from many of the cases that I have because there was the better part of a trial in this case and, as a result, I have a more expansive record. I had witnesses whom I can review and appreciate myself; I had a number of communications, including, in particular, a series of WhatsApp messages.
>
> And after considering that trial record, I can't fully accept certain of the statements today made by Mr. Ahmed about his equality with Mr. Alzanam or other members of the conspiracy. Mr. Ahmed had the money. I believe he was responsible for getting the apartment and the storage unit. He, in particular and most importantly, dealt with the suppliers in China. And based on the record that I saw at trial, it was he who directed other people, even if that is only in a very informal sense.
>
> The case itself is comparable to other SSC synthetic marijuana cases that I've had in terms of the quantity, in terms of the knowledge, in terms of the supervision. But my other defendants accepted responsibility at a much earlier stage. And so it is significant to me that Mr. Ahmed went to trial, although he pleaded guilty in the middle of it. And while I am giving him credit for acceptance, I am saying nonetheless that he is different from some of my other defendants who accepted very, very early on. I'll also note that some of his statements today I believe are not borne out by the record at trial.
>
> But, on the other hand, I accept both parties' submissions that the guidelines in this case, in particular, the conversion ratio that is used, resulted in a range that was too high. I have accepted that Mr. Ahmed, this is his first offense; that he has a family; that he has tremendous community support, as evidenced by the many folks in the courtroom today;

4

> that he has a history of both legitimate employment and service to his family and community.
>
> So when I've thought about what is the appropriate sentence, I am concerned about deterrence, both specific and general. I am concerned about promoting respect for the law and providing a just punishment for the offense. And I am concerned about prevention of unwarranted sentence disparities between Mr. Ahmed and other folks I've sentenced in other synthetic marijuana cases, in other narcotics cases. And so I do agree with, I think, everyone that the guidelines range of 240 months is too high.
>
> Based on all of the factors, both good and bad, the nature of Mr. Ahmed's involvement, and the nature of his involvement in the community, I'm varying downward to a term of 80 months' imprisonment. And I am ordering that that term be followed by a term of three years of supervised release because that is what the — I believe the statute calls for….

(Dkt. #108 at 43-44).

Mr. Ahmed appealed from the judgment of conviction to the United States Court of Appeals for the Second Circuit. (Dkt. #106). By summary order dated January 17, 2023, the Second Circuit affirmed his conviction and sentence. (Dkt. #117).

Mr. Ahmed filed a *pro se* motion for compassionate release that was received by the Court on May 2, 2023, and filed under seal ("Def. Br."). (*See also* Dkt. #118 (scheduling order)). The Government filed its opposition submission on June 30, 2023, which submission included sealed copies of Mr. Ahmed's medical and disciplinary records from the Bureau of Prisons (the "BOP"). (Dkt. #122). Mr. Ahmed filed his reply submission on July 20, 2023. (Dkt. #123).

5

## APPLICABLE LAW

Under 18 U.S.C. § 3582(c)(1)(A)(i), as modified by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018) (the "FSA), a court may reduce a defendant's sentence upon motion of the Director of the Bureau of Prisons (the "BOP"), or upon motion of the defendant.  A defendant may move under § 3582(c)(1)(A)(i) only after the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

When considering an application under § 3582(c)(1)(A)(i), a court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i); *see generally United States* v. *Kimbell*, No. 21-288, 2021 WL 5441249, at *1 (2d Cir. Nov. 22, 2021) (summary order).  The Second Circuit has summarized the standards pursuant to which district courts must evaluate compassionate release applications:

> A court deciding a compassionate release motion can consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it]." *United States* v. *Brooker*, 976 F.3d 228, 237 (2d Cir. 2020).  But there are three requirements that must be satisfied before a court can grant such relief.  First, absent waiver or forfeiture by the government, an inmate must exhaust administrative remedies by requesting such relief from prison authorities.  Specifically, an inmate may ask the sentencing court to

6

>consider reducing a sentence only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A); *see also United States* v. *Saladino*, 7 F.4th 120, 124 (2d Cir. 2021) (holding that the government may waive or forfeit the exhaustion requirement).  Second, a court must "consider[ ] the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable."  18 U.S.C. § 3582(c)(1)(A); *see* [*United States* v. *Jones*, 17 F.4th 371, 374-75 (2d Cir. 2021)].  Section 3553(a), in turn, lists numerous factors a court must review when imposing a sentence.  These include, as most relevant here, "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "the need for the sentence imposed ... to provide the defendant with ... correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  Third, the inmate must demonstrate that his proffered circumstances are indeed "extraordinary and compelling" such that, in light of these § 3553(a) factors, a sentence reduction is justified under § 3582(c)(1)(A) and would not simply constitute second-guessing of the sentence previously imposed.

*United States* v. *Keitt*, 21 F.4th 67, 71 (2d Cir. 2021); *accord United States* v. *Halvon*, 26 F.4th 566, 570 (2d Cir. 2022).  The district court's discretion includes the power to reduce, as well as to eliminate, the remaining term of a defendant's sentence.  *See Brooker*, 976 F.3d at 237.

The United States Sentencing Commission amended the policy statement contained at U.S.S.G. § 1B1.13, effective as of November 1, 2023, in order to provide guidance as to what constitutes extraordinary and compelling

7

circumstances in defendant-initiated (as distinguish from BOP-initiated) compassionate release requests.  This amendment "as to what constitutes extraordinary and compelling reasons now controls the analysis of a compassionate release motion, however initiated."  *United States* v. *Lopez*, No. 16 Cr. 317-22 (PAE), 2024 WL 964593, at *2 (S.D.N.Y. Mar. 5, 2024).

As relevant here, courts may consider the medical circumstances of a defendant, including whether the defendant is "suffering from a medical condition that requires long-term or specialized medical care" that is not being provided in prison and without which the defendant is at risk of serious health deterioration or death, U.S.S.G. § 1B1.13(b)(1)(C); or is held at a facility affected by or at imminent risk of being affected by an outbreak of infectious disease or other "ongoing public health emergency declared by the appropriate federal, state, or local authority," where "due to personal health risk factors and custodial status," the defendant is at a greater risk of severe complications upon exposure, and where "such risk cannot be adequately mitigated in a timely manner."  *Id.* § 1B1.13(b)(1)(D).  The amended policy statement also recognizes that family circumstances may constitute extraordinary and compelling reasons, as, for example, where the defendant is the "only available caregiver" for an immediate family member.  *See id.* § 1B1.13(b)(3).

As suggested by *Keitt*, the "existence of 'extraordinary and compelling reasons' for a reduction does not mean that a district court must release the defendant."  *United States* v. *Madoff*, 465 F. Supp. 3d 343, 349 (S.D.N.Y. 2020). Even if a court finds that a defendant has established an extraordinary and

8

compelling reason for a reduction in sentence, it still must then consider the Section 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A)(i). "The defendant has the burden to show he is entitled to a sentence reduction." *United States* v. *Ebbers*, No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)).

## DISCUSSION

The Government does not dispute, for purposes of this motion, that the exhaustion requirement in 18 U.S.C. § 3582(c)(1)(A)(i) has been satisfied. (*See* Dkt. #122 at 4 n.1). The Court thus proceeds to consider whether Mr. Ahmed has identified "extraordinary and compelling reasons" warranting his release, and concludes that he has not.

Mr. Ahmed argues that certain of his current medical conditions — including a blood clot in his leg, as well as high cholesterol and diabetes — either have been or could be exacerbated by his exposure to the COVID-19 virus while incarcerated, which exposure includes a bout of COVID-19 in or about January 2022. (Def. Br. 5, 15-16). The Court has reviewed with care nearly 200 pages of medical records concerning Mr. Ahmed's treatment while in BOP custody. On the whole, the Court believes that BOP has responded promptly and appropriately to Mr. Ahmed's proffered medical conditions.

On the issue of increased susceptibility to serious illness or death, Mr. Ahmed has not made a sufficient showing. Mr. Ahmed was diagnosed with a blood clot in 2017, and the Court was aware of the condition at the time of his sentencing. Mr. Ahmed continues to take a blood thinner daily to address the

9

blood clot and wears a compression stocking; on at least one occasion, when he expressed concern about the clot, Mr. Ahmed was taken to an offsite medical facility for imaging. There is nothing in Mr. Ahmed's medical records to indicate that any risks to his health inherent in the blood clot were exacerbated by the COVID-19 virus, and nothing to suggest that potential exposure to the virus in a carceral setting would increase these risks. *See* Centers for Disease Control and Prevention ("CDC"), *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (accessed June 7, 2024) (listing blood clots, but not the type experienced by Mr. Ahmed).[2] Of potential note, the principal evidence Mr. Ahmed presents that his blood clot is a risk to his health is a form that he received from the BOP in December 2021 upon his *refusal* of medical treatment for the clot. (Def. Br. 14).[3]

As it has in prior cases, the Court has also considered the risks to Mr. Ahmed's health as a result of his imprisonment at FCI Lewisburg. *See, e.g.*, *United States* v. *Thaher*, No. 17 Cr. 302-3 (KPF), 2020 WL 3051334, at *5-6 (S.D.N.Y. June 8, 2020), *reconsideration denied*, No. 17 Cr. 302 (KPF), 2020 WL

---

[2] Mr. Ahmed advised the BOP that he also suffered from high cholesterol and diabetes. The CDC lists the latter, but not the former, in its list of medical conditions that might cause someone to "get very sick from COVID-19." *See* CDC, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (accessed June 7, 2024). However, Mr. Ahmed's medical records do not contain a diagnosis of, or treatment specifically for, diabetes.

[3] In addition, the Court notes that Mr. Ahmed refused the COVID-19 vaccine while incarcerated. *See generally United States* v. *Felipe*, No. 18 Cr. 744-2 (KPF), 2022 WL 36832, at *4 (S.D.N.Y. Jan. 3, 2022) (collecting cases where district courts have denied compassionate release requests made by movants who have declined to receive the COVID-19 vaccine).

5202093 (S.D.N.Y. Sept. 1, 2020). To that end, this Court has scrutinized BOP's listing of confirmed cases among inmates at each facility. *See* https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp (last accessed June 7, 2024). As of the date of this Order, BOP has identified no current cases of COVID-19 among inmates at FCI Lewisburg. On balance, this Court concludes that the danger that Mr. Ahmed faces from infection with COVID-19, even accounting for his proffered risk factors, does not in and of itself amount to an extraordinary and compelling reason for granting compassionate release.

Mr. Ahmed advances an additional argument for compassionate release based on his family circumstances. Having argued unsuccessfully at sentencing that his role as the primary breadwinner (and the sole English-speaking parent) for his family warranted a non-incarceratory sentence on the grounds of family circumstances, Mr. Ahmed now argues that his wife's arthritis renders her incapable of caring for their children. (Def. Br. 15). As the Government observes (Dkt. #122 at 6-7), Mr. Ahmed has submitted no substantiation of his wife's medical issues, and, perhaps more importantly, no evidence that those issues prevent her from caring for their children.

"The animating principle of [U.S.S.G. § 1B1.13(b)(3)] is that there exists an extraordinary and compelling reason for release when the defendant has a close family member who is completely unable to care for himself or herself and for whom the defendant would be the only available caregiver." *United States* v. *Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020). And while courts have granted

11

compassionate release motions predicated on family circumstances, the evidence of the defendant's criticality to the preservation of the family unit in those cases is far more substantial than that presented here.  *See, e.g.*, *United States* v. *Messina*, No. 11 Cr. 31 (KAM), 2024 WL 2853119, at *6 (E.D.N.Y. June 4, 2024) (collecting and distinguishing cases in which motions were granted because of family circumstances).  Although the Court is sympathetic to Mr. Ahmed's situation, the record before the Court does not establish that he is the only available caregiver for his children.

Finally, even were the Court to have found that either or both of Mr. Ahmed's medical conditions or family circumstances amounted to "extraordinary and compelling," it would still deny his motion after considering the factors set forth in 18 U.S.C. § 3553(a), including "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the needs "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant."  *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).  For approximately one year, Mr. Ahmed operated an extensive K2-trafficking ring, in which he recruited and supervised others to conduct the dangerous business of manufacturing SSC.  Mr. Ahmed only pleaded guilty at the close of the Government's case at trial, after a veritable mountain of inculpatory evidence had been introduced against him.  Even at his sentencing, Mr. Ahmed refused to accept responsibility, making demonstrably false arguments about

12

the hierarchy of the charged conspiracy and about his "withdrawal" therefrom. Reading his submissions in this case, the Court has no confidence that Mr. Ahmed has learned from his experiences in the criminal justice system, or that he is read to lead a law-abiding life.

## CONCLUSION

For the foregoing reasons, Defendant Munif Ahmed's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is DENIED. The Clerk of Court is directed to terminate the motions at docket entries 64, 74, and 75, which were resolved by earlier orders of the Court. The Clerk of Court is further directed to send a copy of this Order to Mr. Ahmed at his address of record.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Opinion would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated:  June 10, 2024
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge